**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NBK Innovation XIII, LLC et al.,<br><br>Plaintiffs<br>v.<br><br>Allison Wong, et al.,<br><br>Defendants | Case No.: 2:22-cv-01415-JAD-DJA<br><br>**Order Granting Summary Judgment in Favor of Defendant Allison Wong and Closing Case**<br><br>[ECF Nos. 88, 96, 97, 98, 101, 102] |

In this fraud-based action, a group of investors alleges that Suavei, Inc.—a cybersecurity startup launched by Afonso Infante in Nevada and identifying his then-wife, Allison Wong, as a cofounder and director—was materially different from the company presented to them before they bought into it. The investors attribute the false statements and omissions principally to Infante, but they also seek to hold Wong liable, theorizing that she never effectively left Suavei's board and knew enough about problems within the company to question what Infante later told investors. Default judgments have been entered against Suavei and Infante, and sole remaining defendant Wong now moves for summary judgment in her favor. The investors oppose and include a cross-motion for partial summary judgment in their response. They also seek more time to reply in support of that cross-motion and leave to file a surreply. Nonparty Frank DeJoy has filed motions to seal various filings including certain deposition materials that Wong used in her reply.

Despite crediting the investors' evidence and theory of the case, the record does not permit a reasonable jury to find Wong for the challenged transactions, so I grant summary judgment on all claims against her. I deny the investors' cross-motion as untimely, which moots their request for more time to file a reply brief. I deny them leave to file a surreply because

Wong's reply presents no new arguments that require additional briefing; to the extent that any reply exhibits exceed the proper scope of reply, I do not consider them. And I grant DeJoy's sealing requests in part: I grant his request to anonymize his identity on the docket itself but deny all other requests because he has not shown compelling reasons to overcome the public's right of access to court documents.

## Background

This case principally concerns the investors' purchases of Suavei securities in 2020 and 2021. Both sides, however, rely on events that preceded those investments—including Suavei's formation, Wong's involvement in the company, and her service on its board—to frame their competing characterizations of her role, knowledge, and responsibility during the investment period.

### A. Wong joins Suavei's two-person board.

Afonso Infante started Suavei with a friend in 2015 to develop a cloud-based product that could detect vulnerabilities in internet-connected devices.[1] At the time, Wong was working as a product manager for another cybersecurity company.[2] She testified that her background led her to help Infante as he developed Suavei's product.[3] But the record does not give a clear picture of the extent of that assistance, and Wong denies that she wrote the code or developed the technology.[4] And while she helped prepare presentation slides for potential investors, the record does not show how many slides she worked on, what she contributed to them, or whether Suavei

[1] ECF No. 88-2 (Wong's declaration) at ¶ 4.

[2] ECF No. 89-11 (Wong's deposition transcript) at 8:19–24.

[3] *Id.*

[4] ECF No. 88-2 at ¶ 5.

ever presented them to actual investors.[5] Wong's role in Suavei became more formal in 2017, however, when Infante told her that the company needed a second director, and she agreed to join him on its two-person board as a cofounder.[6] According to Frank DeJoy, who later became Suavei's chief executive officer (CEO), Wong also held the CEO title before he assumed the position in February 2019.[7]

**B. Wong says that she left Suavei in February 2019, but she did not disappear from the company's orbit.**

By Wong's account, her formal role at Suavei ended in 2019.[8] Shortly after Frank DeJoy became CEO, Wong learned through LinkedIn that Infante had hired him without consulting her.[9] She confronted Infante, and the two agreed that she would have no further role in the company.[10] Wong understood that conversation as her resignation from Suavei's board.[11]

But Wong did not end all contact with Suavei.[12] She acknowledges that she continued receiving some company emails during 2019 and occasionally offered assistance, including helping DeJoy with an investor-pitch competition because he was new to the organization.[13] And DeJoy, impressed by how Wong handled customer-facing interactions—and by what he viewed as her product knowledge and communication skills—asked her to join a call with

---

[5] ECF No. 88-11 at 22:2–24.

[6] *Id.* at 8:5–16; ECF No. 88-2 at ¶ 5.

[7] ECF No. 91 (DeJoy's deposition) at 18:18–22 (sealed).

[8] ECF No. 88-2 at ¶¶ 9–10.

[9] *Id.* at ¶ 8.

[10] *Id.* at ¶ 9.

[11] *Id.*

[12] *Id.* at ¶ 10; ECF No. 89-11 at 41:16–25.

[13] ECF No. 89-11 at 40:16–25.

another technology company in June 2019.[14] In one instance, Wong advised him that another company was not a good fit for Suavei's product.[15] Wong nevertheless avers that her involvement was limited: she was not a signatory on Suavei's bank accounts, lacked access to its banking and financial records, and never spoke with investors about their investments.[16]

The parties characterize this continued involvement differently. Wong describes her post-departure actions as mere favors for her husband's company after she had left the board.[17] The investors contend that her resignation was ineffective, pointing in part to Suavei materials that continued to associate her with the company. For example, a presentation that Infante circulated for a March 3, 2020, diligence meeting identified Wong as a board member, cofounder, experienced board leader, and chief technology officer at another cybersecurity company.[18]

**C. DeJoy resigns, Wong separates from Infante, and another group of investors sues in California.**

DeJoy resigned as Suavei's CEO on February 6, 2020. He sent his resignation letter—which raised concerns about several aspects of Infante's management—to Infante's and Wong's Suavei email addresses and mailed a copy to Suavei's listed address, which was then Wong's

---

[14] ECF No. 91 at 26:24–27:3 (sealed).

[15] *Id.* at 17 (sealed).

[16] ECF No. 88-2 at ¶ 14; ECF No. 89-11 at 87:6–88:8. The plaintiffs dispute the extent of Wong's involvement with customers and investors by pointing to meetings she attended with DeJoy. *See* ECF No. 89 at 7. But the cited materials identify only the names of the entities involved; the plaintiffs do not explain whether those entities were customers, investors, prospective customers, or something else.

[17] ECF No. 88-2 at ¶ 10.

[18] ECF No 91 at 54 (sealed).

home.[19] Those delivery methods show that the letter was directed to Wong, but they do not establish what information actually reached her. Wong testified that she was unsure whether she still had access to the Suavei email account[20] and averred that she "wasn't engaged in that at that time."[21] But the record is less clear about how much Wong nevertheless knew of the dispute. She recalled being "aware of the escalating situation," because she was married to Infante.[22] The documentary record also suggests more direct involvement as the response to DeJoy's resignation letter bears the signature of both Infante and Wong.[23]

Wong and Infante separated the following month. They stopped living together after March 2020, and Wong avers that she had no knowledge of and took no part in Suavei's operations after the separation.[24] Two months later, a different group of Suavei investors sued Suavei, Infante, and Wong in the United States District Court for the Southern District of California.[25] Those claims against Wong were dismissed for lack of personal jurisdiction.[26]

### D. After DeJoy's resignation and Infante's separation from Wong, Infante raises $1.17 million from the investor-plaintiffs.

After DeJoy resigned and Infante and Wong separated, Infante set his sights on the investors in this case. Between March and May 2021, Infante held conferences and Zoom

---

[19] *Id.* at 27 (sealed).

[20] ECF No. 89-11 at 59:12–18.

[21] *Id.* at 46:20–23.

[22] *Id.* at 46:22–23.

[23] ECF No. 91 at 32–33 (sealed).

[24] *Id.* at ¶¶ 12, 15

[25] ECF No. 89-8 at 2–3.

[26] The plaintiff-investors rely principally on the filings from that case to show that accusations about Infante's conduct had been made and that Wong eventually learned about them.

meetings, gave slide presentations, exchanged emails, and shared documents with the plaintiff-investors, most of whom were in California.[27] Infante portrayed Suavei as an established, profitable, and growing cybersecurity company with 10 large-enterprise customers and 20 additional customers through the Amazon Web Services Marketplace.[28] But when the investors asked to contact customers about their use of and experience with Suavei's products, Infante declined.[29] Relying on his representations, the investors signed Simple Agreements for Future Equity (SAFE) and invested a combined $1,173,500 in Suavei.[30] Bank statements that Infante produced in February 2022 later revealed that his representations about the number and size of Suavei's customers were false, and the investors also learned that he was not working full time for Suavei but was actually employed by one of its competitors.[31]

Although Wong's name appeared in materials associated with Suavei, she is otherwise largely absent from the fundraising record. At least one presentation identified Wong as a Suavei cofounder,[32] and Ronald Collette, a member of one plaintiff entity, separately confirmed through the Delaware Secretary of State that Wong and Infante were listed as Suavei directors.[33] But no investor claims to have met or communicated with Wong.[34] Wong avers that she neither

---

[27] ECF No. 89-2 (Ronald Collett's declaration) at ¶ 5.

[28] *Id.* at ¶ 11; ECF No. 89-3; ECF No. 89-4.

[29] ECF No. 89-2 at ¶ 11.

[30] *Id.* at ¶¶ 7–11.

[31] *Id.* at ¶¶ 11, 14.

[32] ECF No. 89-4 at 9.

[33] ECF No. 89-2 at ¶ 7.

[34] ECF No. 89 at 8.

participated in the fundraising nor learned of the investments until she was served with this lawsuit, and the plaintiffs identify no evidence to the contrary.[35]

**E. After Suavei and Infante default, Wong and the investors file competing summary-judgment motions, spawning additional briefing and sealing disputes.**

The investors filed this action against Suavei, Infante, and Wong on August 30, 2022. Their complaint asserts ten claims arising from the alleged investment fraud: two federal securities claims; seven California statutory and common-law claims for securities violations, unfair competition, fraud, fraudulent concealment, constructive fraud, and negligent misrepresentation; and a final claim for breach of fiduciary duty. Suavei and Infante did not defend the action, and the court entered default judgments against them.[36]

Wong now moves for summary judgment on all claims against her. The investors oppose that motion and cross-move for summary judgment against Wong on liability.[37] Wong argues in her reply that the cross-motion was untimely.[38] The investors have also asked to extend their deadline to file a reply supporting the cross-motion and for leave to file a surreply addressing Wong's summary-judgment arguments. Adding to the mix, DeJoy seeks to seal the nine deposition pages Wong used in her reply and all filings concerning his testimony.[39] He also asks that his name be removed from, or replaced with "Third-Party Witness" in, all public docket entries, captions, filing titles, and CM/ECF text entries that identify him.

---

[35] ECF No. 88-2 at ¶¶ 15–16.

[36] ECF No. 34 (Suavei); ECF No. 39 (Infante); ECF No. 87 (order denying motion to set aside).

[37] ECF No. 89 at 30.

[38] ECF No. 92 at 22.

[39] ECF Nos. 96, 97, and 102 (sealed).

## Discussion

**A. DeJoy has not shown compelling reasons to keep his materials sealed from the public, but his name will be anonymized on the docket.**

In April 2023, DeJoy produced documents in response to a third-party subpoena.[40] When DeJoy was deposed on October 25, 2024, his counsel designated the deposition transcript and its exhibits confidential under the protective order that the court had entered the previous year and requested that the materials be filed under seal if they were later used in a court proceeding.[41] When the plaintiffs later submitted excerpts from DeJoy's testimony and related exhibits with their summary-judgment briefing, they moved to seal them, contending that they disclosed Suavei's trade secrets and other sensitive business information about its software, customers, sales, revenue, investors, and internal-management disputes.[42] Wong did not oppose the sealing motion. Instead, she filed her summary-judgment reply,[43] and the parties stipulated to remove the confidentiality designation from the transcript excerpts attached to it.[44]

The magistrate judge found compelling reasons—including the risk of disclosing trade secrets and sensitive business information—to keep the plaintiffs' exhibits under seal,[45] and he separately granted the stipulation de-designating the excerpts attached to Wong's reply.[46] DeJoy then filed two sealed motions to seal. Those motions seek several forms of relief that implicate

---

[40] ECF No. 90 at 2.

[41] *See* ECF No. 38; ECF No. 90 at 2.

[42] ECF No. 90.

[43] ECF No. 92.

[44] ECF No. 93.

[45] ECF No. 94.

[46] ECF No. 95.

different standards: (1) restoration of the confidentiality designation, enforcement of the protective order, and corrective relief for alleged violations of the protective order; (2) sealing of deposition excerpts and related judicial records; and (3) replacement of DeJoy's name with a neutral designation.

### *1. DeJoy's request to redesignate his deposition is not properly raised in these sealing motions.*

DeJoy devotes much of his briefing to arguing that the parties improperly de-designated portions of his deposition without providing him notice or following the challenge procedures in the stipulated protective order. According to DeJoy, he was the Designating Party, the protective order required notice and an opportunity to be heard before any challenge to his designation could proceed, and the parties nevertheless stipulated between themselves to de-designate nine pages of his testimony. He relies on those alleged procedural defects not only to seek restoration of the confidentiality designation but also as a basis for sealing the deposition excerpts, restricting future filings concerning his testimony, and altering existing docket entries. But those arguments concern the validity of the de-designation process and the continued operation of the protective order. Restoring a discovery confidentiality designation does not address whether the same material should be sealed in the court's docket.

Discovery confidentiality and judicial-record sealing are distinct processes. A protective order regulates the parties' use and disclosure of discovery material, while sealing determines whether material filed with the court may be withheld from public access.[47] And when discovery material is submitted in connection with a summary-judgment filing, a confidentiality

[47] *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677–78 (9th Cir. 2010).

designation alone does not satisfy the heightened standard for sealing.[48] DeJoy is essentially arguing that the magistrate judge shouldn't have granted the stipulation because he received no notice and because the parties failed to comply with the protective order's challenge procedures. But the vehicle to challenge a magistrate judge's allegedly wrongfully granted stipulation is an objection filed within 14 days under Federal Rule of Civil Procedure (FRCP) 72(a) and Local Rule IB 3-1(a). DeJoy did not file such an objection or address the regal standard that would apply to one.[49]

***2. DeJoy has not shown compelling reasons to seal.***

Even if DeJoy had filed a proper objection and established that his deposition testimony deserves a confidential discovery designation, that wouldn't mean that the excerpts in this court's docket should be sealed.[50] Designating information as "confidential" during discovery is a different process than sealing court filings from the public. "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."[51] "[Courts] start with a strong presumption in favor of access

---

[48] *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).

[49] Both parties also request attorneys' fees, and DeJoy raises several related allegations of noncompliance. Among other things, he contends that ECF No. 92-5 was publicly filed before the magistrate judge approved the parties' de-designation stipulation; that later filings publicly quoted, summarized, or referenced material that he maintains remained protected; and that Defendant failed to retrieve or correct those disclosures after receiving notice of his objection. DeJoy identifies those circumstances as grounds for enforcement of the protective order and other corrective relief and, in part, in opposing Wong's request for fees. Those allegations likewise concern compliance with the protective order and the appropriate remedy for any violation, issues that the court does not resolve through these sealing motions.

[50] ECF No. 96 at 8; ECF No. 104 at 8 (requesting that any use of his deposition testimony be filed under seal and that filings already disclosing that testimony on the public docket—including the exhibit containing the nine de-designated deposition pages—be retroactively sealed or redacted).

[51] *Ctr. for Auto Safety v. Chrysler Grp.*, LLC, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *Nixon v. Warner Commnc'ns, Inc.,* 435 U.S. 589, 597 (1978)).

to court records."[52] "A party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the 'compelling reasons' standard."[53] "A court may seal records only when it finds a compelling reason and articulates the factual basis for its ruling, without relying on hypothesis or conjecture."[54] "The court must then conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret."[55] "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."[56]

DeJoy offers reasons for why, in his view, the deposition excerpts should be shielded from the public. First, he contends that public association with this litigation and the excerpts will cause, and has caused, him concrete professional and economic harm. Second, he argues that the parties selectively disclosed portions of his testimony in a manner that creates a misleading impression of his credibility and thus uses the judicial record for an improper purpose. Only Wong opposes DeJoy's sealing requests.

*a. DeJoy has not shown that his asserted professional harm justifies sealing.*

DeJoy argues first that public access to the deposition excerpts and this litigation threatens his professional standing and, in turn, his career prospects and business relationships. He says that the risk is especially acute because he holds a public-facing executive position, regularly interacts with government agencies and industry partners, and works in a field in which

---

[52] *Id.* (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[53] *Id.* (quoting *Kamakana*, 447 F.3d at 1178).

[54] *Id.* (cleaned up).

[55] *Id.* (cleaned up).

[56] *Kamakana*, 447 F.3d at 1179.

trust and reputation carry substantial weight.[57] In his view, ordinary due diligence magnifies that risk: a search linking his name to this fraud litigation—particularly one that returns his deposition as a discrete PACER result—could cause employers, investors, business partners, or government contacts to view him as unreliable or too risky to work with. He adds that the selected deposition pages, stripped of their context, make him appear uncertain, inconsistent, or evasive. And he points to a prior job opportunity that he says was withdrawn after the prospective employer discovered his connection to the California litigation, along with a later judgment that he says awarded damages for lost income, as evidence that the professional harm he fears has happened before and is not merely speculative.[58]

But DeJoy does not show that the allegedly misleading excerpts are likely to cause the professional harm that he predicts. He stresses the importance of reputation in his industry, but his theory depends on several assumptions: that employers, business partners, or government contacts will find the excerpts, interpret them as showing that he is unreliable or evasive, and choose not to associate with him for that reason. The record identifies no person who has reacted to these excerpts that way and no other evidence connecting their particular contents to a likely loss of employment, business, or professional standing. So although DeJoy offers specific reasons why he believes that the excerpts could create a misleading impression, he has not shown that the impression is likely to produce the professional consequences he fears.[59]

---

[57] The motion cites DeJoy's declaration for these assertions but does not attach the declaration or any exhibits supporting them.

[58] DeJoy provides no exhibit supporting this assertion other than his citation to the California case. ECF No. 109 at 7 (citing Case No. 3:20-cv-00862-L-AHG, ECF Nos. 129–130, S.D. Cal., Nov. 13, 2023). That docket reflects that DeJoy obtained a default judgment.

[59] *See Ameriprise Fin. Servs., LLC v. Intervening Advisors*, No. 25-4575, 2026 WL 84565, at *3 n.4 (9th Cir. Jan. 12, 2026) (unpublished) (rejecting speculative fears of reputational harm, standing alone, as insufficient to overcome the presumption of public access).

DeJoy's broader concern about being associated with this litigation does not justify the scope of sealing he requests either. The California action gives that concern more substance than a generalized claim that litigation may harm one's reputation, and I assume for purposes of this motion that it identifies a sufficiently concrete professional interest. But DeJoy asks the court to seal every filing that uses or discusses his deposition testimony, including filings that are already public. He does not explain why all of the information in those filings deserves secrecy, why targeted redactions would be inadequate, or why wholesale sealing is necessary to prevent the injury he identifies. Indeed, some filings appear to contain only legal argument or innocuous references to his testimony, and some of the disputed deposition pages contain no substantive testimony at all. His blanket request thus extends well beyond the material that allegedly creates the risk of professional harm.

The nature of DeJoy's asserted injury underscores that mismatch. If his concern is that selected excerpts create a misleading impression of his credibility, supplying the allegedly omitted context addresses that problem more directly than sealing every filing in which his deposition appears. And if his concern is instead that his name is publicly searchable in connection with this litigation, that is principally a request to conceal his association with the case—not a showing that every document containing or discussing his testimony must be sealed. DeJoy does not explain why narrower measures would fail to protect either interest. Because sealing must be tailored to the material for which secrecy is justified, I deny DeJoy's request to seal wholesale every filing concerning his deposition.[60]

[60] *See Foltz*, 331 F.3d at 1137.

*b. DeJoy has not shown that the excerpts were filed for an improper purpose.*

Compelling reasons may exist if court records could be used as a "vehicle for improper purposes," such as to "gratify private spite or promote public scandal," circulate libelous statements, or disclose business information that could harm a litigant's competitive standing.[61] DeJoy invokes that principle not merely because members of the public might later use the excerpts to his professional detriment, but because he contends that the parties themselves used the docket improperly by selectively de-designating and filing testimony that portrays him as uncertain, unreliable, or evasive. He argues that Wong chose excerpts emphasizing the limits of DeJoy's post-departure knowledge and his uncertainty about particular subjects while leaving confidential other testimony that supplied context or reflected less favorably on Wong. As one example, DeJoy contends that Wong's counsel contributed to his uncertainty during an exchange by declining to clarify the relationship between a company and one of the named plaintiffs, then later publicly filed the portion reflecting that uncertainty. And because the resulting exhibit appears on PACER under his name, Wong turned those selected excerpts into a searchable public record that creates the very sort of misleading and professionally damaging portrayal that, in his view, constitutes the "improper use *Kamakana* intends to prevent."[62]

The record supplies a concrete adjudicative explanation for Wong's decision to de-designate and file these particular excerpts, and the contemporaneous correspondence confirms it. The plaintiffs relied on DeJoy's testimony and documents to oppose summary judgment, and Wong responded that DeJoy had left Suavei before the plaintiffs made their investments and therefore lacked personal knowledge of the events underlying their claims against him. The

[61] *Id.* (citing *Nixon*, 435 U.S. at 598–99).

[62] ECF No. 104 at 6.

substantive portions of the nine-page exhibit correspond directly to that argument. Consistent with that litigation purpose, Wong's counsel explained that he had not previously challenged the deposition's confidentiality designation "to avoid time and expense," but now needed pages 92, 95–96, and 99–101 for Wong's reply.[63] He therefore proposed de-designating only those pages in exchange for Wong's agreement not to oppose the plaintiffs' motion to seal the remainder, explaining that the broader confidentiality dispute was not "worth fighting over."[64]

DeJoy may sincerely believe that public disclosure of these excerpts could harm his professional reputation or future employment opportunities, and I do not discount his evidence that his association with Suavei has had professional consequences before. But DeJoy has shown principally that public association with this litigation, coupled with unfavorable interpretations of his testimony, may affect how others perceive him professionally. He has not shown that the nine excerpts contain confidential commercial information or that their disclosure will be used for improper purposes.[65] DeJoy has therefore not carried his burden to overcome the strong presumption of public access that applies to judicial records filed in connection with dispositive motions.

---

[63] ECF No. 103-6 at 2.

[64] *Id.*

[65] I recognize that DeJoy's status as a nonparty distinguishes this case from *Kamakana* in one factual way: unlike a litigant, he did not voluntarily place his conduct at issue, and he provided his testimony under subpoena. DeJoy repeatedly relies on that status in arguing that his privacy and professional interests deserve particular protection. But he does not identify authority establishing that a nonparty's status impacts the *Kamakana* standard governing public access to judicial records or reduces the showing required to seal materials submitted in connection with summary judgment. I therefore account for DeJoy's nonparty status in evaluating the interests he asserts, but I apply the same public-access framework.

### *3. DeJoy has shown a basis for limited anonymity on the public docket.*

DeJoy's final request is, in substance, one for pseudonymity. He asks that his name be removed from or replaced with "Third-Party Witness" in docket entries, captions, filing titles, and CM/ECF text. Although he includes that request in his sealing motions and does not invoke the anonymity standard, the relief he seeks would leave the court and the parties aware of his identity while preventing a search of his name from identifying him as a witness in this litigation. A party may proceed anonymously "[if] the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."[66] The Ninth Circuit allows "parties to use pseudonyms in the unusual case [in which] nondisclosure of the party's identity is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment."[67]

I find that DeJoy has shown a sufficient basis for limited protection of his identity on the public-facing docket. Given his profession, he identifies a particular concern with having his name appear in searchable docket entries that associate him with this litigation and his deposition. He distinguishes that exposure from references to him within merits briefing, which do not separately index his deposition under his name in the same way.[68] And because he is a nonparty whose identity is already known to the litigants, replacing his name with a neutral

---

[66] *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). Neither side invokes *Advanced Textile* or otherwise addresses whether the anonymity framework applicable to parties extends to nonparty witnesses. I rely on *Advanced Textile* only as useful guidance because DeJoy seeks functionally similar relief—concealment of his identity while leaving the substance of the proceedings public.

[67] *Id.* (citing *United States v. Doe*, 655 F.2d 920, 922 n.1 (9th Cir. 1981) (internal quotations omitted).

[68] *See* ECF No. 109 at 10.

designation would impose little apparent prejudice on their ability to litigate this case.[69] So I direct the Clerk to identify DeJoy instead as "Third-Party Witness" in the publicly searchable docket text. This limited relief does not require the parties to remove his name from the text of documents that are otherwise part of the public record.

**B. The plaintiffs are not entitled to additional summary-judgment briefing.**

With the motions to seal resolved, I turn to the plaintiffs' motion to extend time to file a reply in support of their cross-motion for partial summary judgment and for leave to file a surreply in response to Wong's motion for summary judgment.

***1. The plaintiffs' untimely crossmotion will be treated only as an opposition.***

The plaintiffs embedded what they characterize as a cross-motion for partial summary judgment in their opposition to Wong's summary-judgment motion,[70] and Wong requests that the court disregard it as untimely.[71] To be sure, the filing of a summary-judgment motion must comply with the federal and local rules. FRCP 56 permits summary-judgment motions only within the time set by the court,[72] and this district's local rules likewise require dispositive

[69] This determination, however, does not support the broader sealing relief that DeJoy seeks. He does not explain why protecting his identity requires concealing the substance of those judicial records. Indeed, his own argument identifies the asserted injury more narrowly: the searchable association between his name and this litigation. Replacing his name with "Third-Party Witness" addresses that concern without removing judicial records from public access.

[70] ECF No. 89 (filing entitled "plaintiffs' opposition to defendant Allison Wong's motion for summary judgment and cross-motion for partial summary judgment") (cleaned up).

[71] ECF No. 105 at 3–4.

[72] Fed. R. Civ. P. 56(b) ("Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.").

motions to be filed by the deadline established in the scheduling order.[73] Magistrate Judge Albregts set the final dispositive-motion deadline for January 30, 2026,[74] but the plaintiffs did not file their crossmotion for partial summary judgment until February 20, 2026—21 days late. I therefore consider the filing only as an opposition to Wong's motion, not as a separately filed dispositive motion. So the plaintiffs' motion to extend their deadline to file a reply in support of that motion is denied as moot.[75]

***2. Wong's reply raises no new matter that warrants a surreply.***

The plaintiffs also seek leave to file a surreply to respond to points Wong raises in her reply in support of her timely motion for summary judgment. Generally, sur-replies are "discouraged" under Local Rule 7-2(b).[76] But if a reply brief raises new issues or presents new evidence, the court may grant the non-movant an opportunity to respond and address them.[77] Otherwise, the court may deny further briefing.[78]

The plaintiffs contend that a surreply is warranted here because Wong's reply expanded the evidentiary record and introduced dispositive arguments that, in their view, were not fairly presented in Wong's opening motion. Wong did submit three new items with her reply: the

---

[73] L.R. 26-1(b)(4) ("Unless the discovery plan otherwise provides and the court so orders, the deadline for filing dispositive motions is 30 days after the discovery cut-off date. The plan must state the calendar date on which dispositive motions are due[.]").

[74] ECF No. 86 at 2.

[75] ECF No. 101.

[76] *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007).

[77] *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[If] new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." (cleaned up)).

[78] *See Finley v. Fax*, 683 F. App'x 630, 631 (9th Cir. 2017) (unpublished) ("The district court did not abuse its discretion in denying [the] request for leave to file a surreply because the district court reviewed the briefing and found no new issues raised in defendants' reply that necessitated further argument.").

order dismissing her from *Lin v. Suavei, Inc.*,[79] the separate Southern District of California action involving Suavei, Infante, and Wong; additional excerpts from Ronald Collett's deposition, and excerpts from Frank DeJoy's deposition.[80] The plaintiffs also identify two new legal arguments: that they failed to prove the elements of a primary Rule 10b-5 violation against Wong and that they cannot rely on Section 20(a) because they did not plead a separately labeled control-person claim. They argue that these grounds extend beyond Wong's opening theory that she had no communications with or involvement in their investments, so they seek leave to address them in a surreply. The plaintiffs also want to answer Wong's request to strike their cross-motion as untimely and procedurally improper. Because Wong's filing served both as a reply supporting her motion and as an opposition to the plaintiffs' cross-motion, the plaintiffs maintain that additional briefing is necessary to separate and fully address the overlapping issues.

Wong argues that a surreply is unwarranted because her summary-judgment reply did not introduce new matters; it merely answered theories and evidence that the plaintiffs raised in their opposition.[81] She maintains that her challenge to the elements of the Rule 10b-5 claims appeared in her opening motion, which asserted that the plaintiffs could not establish any element of their claims. And she contends that her Section 20(a) discussion was necessarily responsive because the plaintiffs invoked control-person liability for the first time in their opposition, despite not pleading a separately identified Section 20(a) claim. By Wong's account, the plaintiffs had their opportunity to prove their claims in the opposition, and a surreply would merely give them an unfair crack at curing the deficiencies that Wong identified in her reply.

---

[79] *Lin v. Suavei, Inc. et al.*, Case No. 3:20-cv-00862-LAHG (S.D. Cal).

[80] ECF No. 101.

[81] ECF No. 105 at 4–5.

The plaintiffs have not shown that Wong's reply raised new matters warranting a surreply. Wong's discussion of the Rule 10b-5 elements tracks arguments from her opening motion, and her Section 20(a) analysis responds directly to the control-person theory that the plaintiffs raised in their opposition. Wong also attached supplemental exhibits to her reply, but to the extent that any portion of those materials exceeds the proper scope of rebuttal, I do not rely on it. So the plaintiffs suffer no prejudice from the inability to provide additional briefing. Because their proposed surreply largely repeats, refines, or expands arguments that they made—or could have made—in their opposition, I deny leave to file it.[82]

**C. The parties' evidentiary objections do not materially alter the summary-judgment record.**

Before I reach the merits of the summary-judgment briefing, I first address the parties' evidentiary objections to the summary-judgment record. The 2010 amendment to FRCP 56 "eliminate[d] the unequivocal requirement" that evidence must be admissible in its present *form* in order to be considered at summary judgment.[83] Instead, the rule mandates that the *substance* of the proffered evidence be admissible at trial.[84]

***1. The parties' relevance objections are moot, and their remaining objections are overruled.***

Both sides object that portions of the other's evidence are irrelevant. But relevance objections generally add nothing at summary judgment because FRCP 56 already requires the

---

[82] Even if I had granted leave to file the proposed surreply, the arguments would not alter my analysis or the outcome of any issue addressed in this order.

[83] *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) (unpublished).

[84] *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment; *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

court to decide whether the evidence creates a genuine dispute over a fact that matters to the outcome.[85] Evidence that does so is relevant; evidence that does not cannot affect the ruling. So I overrule the parties' relevance objections as moot.

Wong also objects to plaintiffs' Exhibits D[86] and S[87] as hearsay, but her objection consists of a single conclusory sentence that doesn't identify the statements she challenges. That generalized objection is insufficient, and I do not find that the substance of those exhibits is inadmissible, so I overrule it. The parties' remaining objections concern how their opponents characterize the testimony and exhibits. Those are arguments about what the evidence shows, not true evidentiary objections. I have reviewed the cited material and rely on the record itself, not merely counsel's characterization of it.

***2. The court takes limited judicial notice of the <u>Lin</u> litigation.***

The plaintiffs also request that the court take judicial notice of the amended complaint and Wong's declaration filed in *Lin v. Suavei, Inc*. Wong argues that judicial notice is improper because the complaint contains only unproven allegations, and she also notes that the claims against her were dismissed for lack of personal jurisdiction.[88]

Judicial notice is a means to establish the existence of a fact without the necessity of formal proof.[89] Federal courts may take judicial notice "of facts relating to the particular case, though no evidence is introduced, [if] the fact is 'not subject to reasonable dispute,' either

---

[85] *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).

[86] ECF No. 89-6 (January 2022 email exchange among Infante, Salerno, and Collett about Suavei's banking problems).

[87] ECF No. 89-16 (sealed) (emails transmitting a March 2020 due-diligence presentation identifying Wong as a Suavei cofounder, board member, and cybersecurity executive).

[88] ECF No. 92 at 6.

[89] *See Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992).

because it is 'generally known within the territorial jurisdiction,' or is 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'"[90] I therefore take judicial notice of the existence of those filings and the procedural history of the *Lin* litigation, but not the complaint's allegations.[91] But because Wong does not specifically dispute her declaration filed in that case,[92] and her declaration is sworn testimony, I take judicial notice of it.

**D. Wong is entitled to summary judgment on the federal-securities claims.**

With those preliminary issues resolved, I now turn to the merits of Wong's summary-judgment motion and begin with the plaintiffs' federal-securities claims. Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[93] If the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[94] But "mere speculation cannot raise an issue of fact."[95] The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of

---

[90] *Id.* (quoting Fed. R. Evid. 201(b)).

[91] *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003) ("Factual findings in one case ordinarily are not admissible for their truth in another case through judicial notice.").

[92] While Wong states that judicial notice is improper as to the two exhibits, she does not specifically address why judicial notice of her own sworn declaration is improper merely because it was filed in another case.

[93] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[94] *Id.* at 323.

[95] *Emeldi v. Univ. of Or.*, 698 F.3d 715, 728 (9th Cir. 2012).

the nonmoving party's case necessarily renders all other facts immaterial."[96] The court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[97]

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance" related to the purchase or sale of securities when the use violates the regulations promulgated by the Securities and Exchange Commission (SEC).[98] SEC Rule 10b-5 explains it is unlawful: "(a) [t]o employ any device, scheme, or artifice to defraud," "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit" in connection with the purchase or sale of securities.[99] The plaintiffs assert claims under both Rule 10b-5(b), commonly referred to as "maker liability," and Rule 10b-5(a) and (c), commonly referred to as "scheme liability."[100] Wong seeks summary judgment on both claims.

***1. The plaintiffs have not raised a genuine dispute on their maker-liability claim.***

A maker-liability claim imposes liability only on the person who "makes" the alleged misrepresentation or omission—the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.[101] A person who merely participates in preparing a statement, contributes information, or otherwise assists another does

---

[96] *Celotex,* 477 U.S. at 322.

[97] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[98] 15 U.S.C. § 78j(b).

[99] 17 C.F.R. § 240.10b-5.

[100] *See Lorenzo v. SEC*, 587 U.S. 71, 80 (2019) (discussing differences between the provisions but recognizing "considerable overlap" between them); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (reasoning that the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*").

[101] *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

not "make" the statement for purposes of Rule 10b-5(b).[102] Wong argues that she cannot be a maker because she made no representations to the plaintiffs and the plaintiffs did not rely on any statement or omission attributable to her.

The plaintiffs do not dispute that Wong never communicated with them or made the representations on which they relied.[103] They argue that instead Wong is liable as a control person under § 20(a) of the Securities Exchange Act, which imposes secondary liability on a person who controls a primary securities-fraud violator.[104] They theorize that Infante and the company committed the underlying Rule 10b-5(b) violation and that Wong's positions as Suavei's co-founder, former CEO, and one of its two directors gave her the power to control Infante, and Suavei's management, fundraising, and investor disclosures.[105] Wong responds that the plaintiffs never pled a § 20(a) control-person claim against her, so they cannot defeat summary judgment by advancing that theory for the first time in their opposition.

*a. The § 20(a) theory is not new.*

For the plaintiffs to argue a theory of recovery at summary judgment, they must have "either (1) . . . plead the . . . theory in their complaints, or (2) [] ma[d]e known during discovery their intention to pursue recovery on the . . . theory omitted from their complaints."[106] In their complaint, the plaintiffs alleged that "[e]ach of the [d]efendants" made material misrepresentations or omissions in violation of Rule 10b-5(b),[107] that "[d]efendants Infante and

---

[102] *Id.* at 142–45.

[103] ECF No. 89 at 8.

[104] 15 U.S.C. § 78t(a).

[105] ECF No. 89 at 18.

[106] *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

[107] ECF No. 1 at ¶ 41.

Wong are sued as primary participants in the wrongful conduct charged,"[108] and that because of their positions of control and authority, both defendants "did, directly or indirectly, control the content of the statements and representations of Suavei."[109] Though the plaintiffs may not have specifically stated that they were pursuing a § 20(a) liability theory, they did plead facts suggesting that Wong was both a primary violator and a secondary violator sufficient to put the defendants on notice of that theory.[110] But the plaintiffs pled secondary liability only on the theory that Wong controlled Suavei as a director, not that she controlled Infante himself. So only the Suavei-control theory is in play.

*b. The plaintiffs have not shown that Wong controlled Suavei.*

To prevail on a § 20(a) claim, the plaintiffs must show "(1) a primary violation of federal securities laws, and (2) that the defendant exercised actual power or control over the primary violator."[111] "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."[112] The plaintiffs argue that Wong's position as a Suavei director necessarily gave her control over the company. But a corporate title does

---

[108] *Id.*

[109] *Id.* at ¶ 45.

[110] *See, e.g., No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937–46 (9th Cir. 2003).

[111] *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (cleaned up). For purposes of this order, I assume without deciding that Suavei committed a primary violation.

[112] *Id.*

not establish control if the evidence does not connect that influence to the company's operations or the securities offering that produced the alleged violation.[113]

In *Paracor Finance, Inc. v. General Electric Capital Corp.*, the alleged violation arose from a debenture offering for which the placement memorandum contained misrepresentations and omissions about Casablanca Industries, Inc.'s financial performance.[114] They sought to hold Burton Burton, Casablanca's founder, CEO, and board chairman, liable as a controlling person.[115] The panel found that he was not. Although Burton was at least consulted on every major decision, other officers managed the company's day-to-day affairs, and Burton's connection to the debenture offering was thinner still.[116] Casablanca did not authorize him to act on its behalf in the offering, as it had other officers.[117] He knew that the offering was underway and understood the general purpose of the placement memorandum, but he did not read it because he considered the 500-page document too long and complex.[118] Burton did help develop Casablanca's sales projections, but he prepared those projections six months before they appeared in the memorandum, when he could not have known how they would later be used.[119] Although Burton participated in discussions about Casablanca's progress toward the projections,

---

[113] *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) ("[A]lthough a person's being an officer or director does not create any *presumption* of control, it is a sort of red light.").

[114] *Id.* at 1155–56.

[115] *Id.* at 1163.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

the record did not show what he contributed.[120] And the investors did not submit any evidence that Burton even discussed the debenture offering with them.[121]

*Howard v. Everex Systems, Inc.* sharpened that distinction by considering § 20(a) claims against two Everex insiders and reaching opposite results. Howard argued that the defendants artificially inflated the price of Everex stock by falsely representing that the company had achieved profitability and consecutive profit increases.[122] Stephen Hui, the company's CEO and board chairman, participated in Everex's day-to-day management, had authority over the process for preparing and releasing its financial statements, reviewed those statements, and signed them as accurate.[123] That evidence was enough to permit a finding that Hui controlled Everex and participated in inflating the figures on the financial statements.[124] Michael Wong, by contrast, served as a director for less than three months during the events.[125] Although Howard pointed to his general influence within the company, she did not provide evidence showing that Michael was active in the day-to-day affairs of Everex of that he exercised any specific control over the preparation and release of the financial statements.[126] So the panel affirmed summary judgment in Michael's favor.[127]

The record in this case shows that Allison Wong is more like Burton and Michael Wong than Hui. The plaintiffs' evidence permits a fair inference that she once played a meaningful

---

[120] *Id.*

[121] *Id.*

[122] *Id.* at 1059–60.

[123] *Howard*, 228 F.3d at 1065–66.

[124] *Id.*

[125] *Id.* at 1067.

[126] *Id.* at 1067, n.13.

[127] *Id.*

role at Suavei. Allison co-founded the company, may have remained one of its two directors, and was presented to investors as part of its leadership. Early on, she provided technical input, assisted with aspects of the product's design, prepared portions of unidentified presentation slides, helped draft a press release, participated in several startup pitches, recruited a sales advisor, attended company meetings, and occasionally helped DeJoy with customer matters in 2019. She also attended company meetings and may have retained her director's seat after she believed that her active involvement had ended. I credit that evidence for all that it can reasonably establish: Wong was not always a stranger to Suavei, and her early contributions were substantial.

But that evidence does not show that Wong managed Suavei's daily operations, set its policies, oversaw its finances, or directed its fundraising even before the investments at issue. As in *Paracor*, the company's core functions rested elsewhere. Wong testified that other employees handled the company's sales and marketing and that Michael Wiser, Suavei's chief commercial officer,[128] often joined Infante in pitches because of Wiser's technical background.[129] Meetings therefore sometimes occurred without Wong, and she received only "somewhat limited" information about communications with prospective investors."[130]

Wong's connection to Suavei's intellectual property was similarly modest: although she knew that the company had filed several patent applications, she was not named as an inventor.[131] The financial evidence also reveals no separate channel through which Wong exercised control. She was not a signatory on Suavei's bank accounts, did not receive its income

---

[128] ECF No. 89-3 at 2.

[129] ECF No. 89-11 at 39:3–19.

[130] *Id.* at 39:17.

[131] *Id.* at 68:15–25.

statements or balance sheets, and had no access to its financial information.[132] Infante did not seek her approval before withdrawing company funds or paying himself, and Wong testified that she had no visibility into those transactions.[133]

The plaintiffs also point to presentations that identified Wong as a team member. But a company's decision to place someone's name on a leadership slide shows how the company portrayed that person; it does not necessarily show that the person controlled the presentation's contents. Like Burton in *Paracor*, the plaintiffs offer no evidence that Wong prepared that presentation, reviewed it, approved its contents, authorized its distribution, attended the meeting at which it was used, or exercised authority over any representation in it. So Wong's appearance in the presentation does not establish that she controlled the message delivered to prospective investors. The record separately shows that Wong helped prepare portions of some earlier PowerPoint presentations while she was involved with Suavei.[134] But the plaintiffs do not argue that her earlier work was incorporated into the presentations made to them, and the evidence would not support that inference in any event. Wong could not identify the slides she prepared, recall what they contained, explain how they were divided among contributors, or say how they were ultimately presented.[135] She also testified that she may not have seen the completed presentations and retained no copies after her access to Suavei's laptop and email accounts ended.[136]

---

[132] ECF No. 88-2 at ¶ 14; ECF No. 89-11 at 41:2–9.

[133] ECF No. 89-11 at 79:16–80:13.

[134] *Id.* at 22:7–23:10.

[135] *Id.*

[136] *Id.*

The plaintiffs rely on the United States District Court for the Central District of California's decision in *In re Musicmaker.com Securities Litigation*[137] to argue that control-person liability does not require proof that Wong actually exercised her authority over the challenged transactions.[138] They contend that Wong's position as one of only two directors gave her voting power to block or condition Suavei's decisions to solicit investors, offer securities, and distribute financial or technical information.[139] *Musicmaker*, however, addressed what a plaintiff must allege to state a prima facie control-person claim. The court explained that a plaintiff need not plead actual participation or the exercise of actual power because a controlling person may instead establish nonparticipation as part of the good-faith defense.[140] At the pleading stage, then, the relevant question is whether the plaintiff has sufficiently alleged that the defendant possessed the requisite power or influence, not whether the defendant actually exercised it.[141]

But that pleading-stage principle does not relieve the plaintiffs of their evidentiary burden at summary judgment. Wong has produced evidence that she did not participate in Suavei's fundraising, investor solicitations, or disclosures, so the plaintiffs must identify evidence from which a reasonable jury could find that she nevertheless possessed actual authority over those activities to create a genuine dispute. Her status as one of two directors may support an inference that she could block matters requiring board approval, but that inference matters only if

---

[137] *In re Musicmaker.com Securities Litigation*, 2001 WL 34062431 at *16 (C.D. Cal. 2001).

[138] ECF No. 89 at 19.

[139] *Id.*

[140] *Musicmaker.com*, 2001 WL 34062431 at *16.

[141] *Id.*

the challenged fundraising and disclosure decisions were among the matters subject to her authority.

The plaintiffs identify no evidence that bridges that gap. They point to no governing document, board record, testimony, or other evidence showing that Suavei's fundraising or disclosure decisions required board approval, that Wong had veto or equal decision-making authority over those matters, or that Infante submitted those decisions to her. Without evidence connecting Wong's formal position as a director to authority over the challenged activities, a jury would have to speculate that her title alone gave her control over them. That is insufficient to create a genuine dispute of material fact. Because no reasonable jury could find on this record that Wong controlled Suavei with respect to the challenged conduct, I grant Wong's motion for summary judgment on the control-liability theory.

***2. Plaintiffs identify no deceptive act by Wong that supports scheme liability.***

Scheme liability under Rule 10b-5(a) and (c) does not require Wong to have "made" a challenged statement, but it does require evidence that she personally "engag[ed] in a transaction whose principal purpose and effect [was] to create a false appearance of fact" that furthered the alleged scheme.[142] Wong argues that the plaintiffs identify no such conduct, and their response muddies their theory. They first invoke *Janus Capital Group, Inc. v. First Derivative Traders*[143] to argue that Wong need not have communicated directly with an investor for primary liability if she authorized, adopted, or knowingly disseminated a false statement.[144] But they identify no

[142] *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009); *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Avis Budget Grp., Inc. v. Cal. State Tchrs. Ret. Sys.*, 552 U.S. 1162 (2008).

[143] *Janus Cap. Grp., Inc.*, 564 U.S. 135 (2011).

[144] ECF No. 89 at 24.

challenged statement that Wong authorized or adopted and no false information that she personally disseminated.[145]

Instead, they shift to invoking secondary liability under § 20(a). They point to Wong's asserted power as one of Suavei's two directors, reasoning that she could have blocked investor solicitations, conditioned corporate action, investigated Infante, or demanded corrective measures. And they ultimately characterize her failure to exercise that authority as an abdication of her responsibilities that allowed Infante's fraud to continue. Liberally construing those arguments, the plaintiffs appear to treat Wong's inaction as the deceptive conduct. But they do not identify a solicitation or transaction of which Wong was aware, a statement that her silence rendered misleading, or a material fact that she had a duty to disclose to these investors. So I grant Wong's motion for summary judgment on this claim, too.

**E. Wong is entitled to summary judgment on the plaintiffs' California claims.**

The plaintiffs assert three categories of claims under California state law: securities-law claims; a claim under California's Unfair Competition Law; and fraud-based tort claims for fraud and deceit, fraudulent concealment, constructive fraud, and negligent misrepresentation. Wong contends that Nevada's choice-of-law rules require Nevada law to govern this dispute. But even assuming that the plaintiffs are entitled to apply California law here, their claims still fail.

***1. The plaintiffs tacitly concede most of their California claims.***

On those California state-law claims, the plaintiffs' summary-judgment opposition devotes most of its attention to whether California law applies. They briefly address California

---

[145] *Janus* concerned who made a statement under Rule 10b-5(b), and it held that the maker is the person with ultimate authority over the statement's content and whether and how to communicate it. *Janus*, 564 U.S. at 142–43. The Supreme Court also noted that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.*

Corporations Code § 25504, California's analogue to § 20(a) of the Securities Exchange Act, but that argument does not respond to Wong's assertion that the plaintiffs cannot establish essential elements of their Unfair Competition Law and fraud-based claims. A plaintiff's failure to address or oppose arguments in its opposition constitutes abandonment of those claims.[146] Because the plaintiffs did not respond to Wong's arguments as to their California statutory and common-law claims, I deem their silence as consent to their disposition, and I address only their securities claims.[147]

***2. The plaintiffs' claims under Cal. Corp. Code §§ 25400 and 25500 fail.***

California Corporations Code § 25400(d) prohibits inducing another person to purchase a security through "any statement which was, at the time and in light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made . . . not misleading."[148] Section 25500 supplies a civil remedy for buyers or sellers of securities whose prices were affected by conduct prohibited under § 25400.[149] These provisions derive from substantially similar language in the Securities Exchange Act.[150] Because the plaintiffs concede that Wong

---

[146] *See, e.g., Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (finding that the plaintiff abandoned the claims she did not raise in opposition to the defendant's summary-judgment motion).

[147] The proposed surreply would not change my analysis. The plaintiffs contend that Wong "argues that [p]laintiffs have abandoned their California securities law claims except for one." ECF No. 101 at 16. But Wong argues that the plaintiffs "abandoned all of their California statutory and common law claims except for one." ECF No. 92 at 17. So the surreply also does not address the other claims they supposedly abandon.

[148] Cal. Corp. Code § 25400(d).

[149] Cal. Corp. Code § 25400.

[150] *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 405 (9th Cir. 2021) (*citing Kamen v. Lindly*, 94 Cal. App. 4th 197 (2001)).

never made any statements to them, these claims fail for the same reasons as their primary federal-securities claim.

***3. Wong has proven her affirmative defense under § 25504.***

Wong also argues that the plaintiffs cannot show Suavei's primary violation under § 25401 and Wong's secondary liability under § 25504. Section 25401 prohibits an offer or sale of a security in California "by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."[151] Section 25504 is California's analogue to § 20(a), but it reaches deeper: a corporation's principal executive officers and directors are presumptively liable for its securities-law violation, even if they neither participated in the challenged transaction nor controlled the issuer.[152] A director may avoid liability under this section if she proves that she "had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."[153]

Because Wong bears the burden of proving that defense at trial, she faces the corresponding burden at summary judgment. She must establish each component of the defense beyond genuine dispute before the burden shifts to the plaintiffs to identify evidence creating a triable issue.[154] I therefore need not decide for purposes of this motion whether Suavei committed a primary violation of § 25401 or whether Wong remained a Suavei director during

---

[151] Cal. Corp. Code §§ 25401, 25501.

[152] *Hellum* v. *Breyer*, 123 Cal. Rptr. 3d 803, 810 (Cal. Ct. App. 2011) (quoting Cal. Corp. Code § 25504).

[153] *Id.*

[154] *Id.*

the relevant period. I assume both propositions in the plaintiffs' favor and consider only whether Wong has established her statutory defense as a matter of law.

Wong first establishes that she did not actually know that Infante continued soliciting investments after their separation. She testified at deposition that, by February 2020, she and Infante were no longer communicating and that, after they separated the following month, their discussions concerned their child, custody, support, divorce terms, and the division of their personal assets—not Suavei.[155] She also testified that she was not involved in preparing information sent to prospective investors in 2021 and had no personal knowledge of what Suavei sent them.[156] No evidence shows that she received the materials that Infante used, knew that another financing effort was underway, or knew what Infante was telling prospective investors. So the record establishes with no genuine dispute that Wong was subjectively unaware that Infante continued selling securities through the communications challenged here.

The *Lin* complaint nevertheless requires separate consideration under the reasonable-grounds prong. It gave Wong notice that earlier investors accused Infante and Suavei of using misleading communications in an earlier fundraising effort. The relevant question, then, is not whether Wong actually knew that similar conduct continued, but whether those allegations, considered with the circumstances known to her, gave her objective reason to believe that it did.

The complaint put Wong on notice of allegations concerning earlier investments, but by the time it was filed, Wong and Infante had separated, no longer communicated about Suavei, and limited their discussions to their child, divorce, and personal property.[157] She therefore

[155] ECF No. 89-11 at 10.

[156] ECF No. 88-2 at ¶¶ 15–16.

[157] ECF No. 89-11 at 89:1–22.

lacked the ongoing operational involvement, company reporting, or other contemporaneous information that might have caused the earlier allegations to signal that similar solicitations were continuing. That showing shifts the burden to the plaintiffs, but they identify no allegation in the *Lin* complaint or other evidence that would justify the inference that the circumstances known to Wong turned that *past* accusation into notice of an *ongoing* practice. So I find that Wong has met her burden in proving her defense, and I grant summary judgment in her favor on this claim.

**F. Wong is entitled to summary judgment on the fiduciary-duty claim.**

The plaintiffs' final claim rests on the theory that Wong breached fiduciary duties of care and loyalty by failing to act as a prudent director and allowing Infante to operate Suavei unchecked.[158] Because Suavei is a Delaware corporation, Delaware law governs this claim.[159] Directors of a Delaware corporation owe fiduciary duties of care and loyalty to the corporation and its stockholders.[160] The parties sharply dispute whether Wong was a Suavei director when the plaintiffs invested. But that dispute is immaterial because, even assuming that she was, the plaintiffs must still show that Wong owed those duties to them.

Under Delaware law, corporate fiduciary duties to persons who merely expect to become stockholders in the future,[161] a fiduciary relationship instead requires an existing property right or equitable interest.[162] So until an instrument converts into stock, its holder remains a

---

[158] ECF No. 89 at 29.

[159] *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985).

[160] *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) (citing 8 Del. C. § 141(a)).

[161] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1263 (Del. 2004).

[162] *Simons v. Cogan*, 549 A.2d 300, 304 (Del. 1988).

contractual claimant whose rights are governed by the instrument's terms—not a stockholder to whom fiduciary duties are owed.[163]

The plaintiffs' SAFE agreements gave them only a conditional right to receive stock. Each SAFE states that it provides "the right to certain shares" of Suavei's capital stock and defines the instrument as containing "a future right to shares of Capital Stock."[164] Under Section 1(a), that right would convert into preferred stock only if Suavei completed an equity financing. If a liquidity or dissolution event occurred first, Sections 1(b) and 1(c) instead entitled the holder to specified payments.[165] And Section 5(c) confirms that, until shares issued under Section 1, a SAFE holder could not vote, was not deemed a capital-stock holder, and had no stockholder rights to consent to corporate action or receive notice of stockholder meetings.[166]

No evidence shows that Suavei completed an equity financing, that the plaintiffs' SAFEs converted, or that Suavei issued them shares. The only record document identifying Suavei's stockholders—the fully executed consent attached to DeJoy's 2019 email—lists Infante, C5 Capital, and Sean McBride.[167] So they have shown, at most, contractual rights and an expectancy of future equity[168] but not the existing property right or equitable interest necessary to support a fiduciary relationship.

---

[163] *Id.*

[164] ECF No. 89-5 at 2, 4.

[165] *Id.* at 2.

[166] *Id.* at 6. The agreement does have a separate characterization of the SAFE as common stock for specific tax purposes, but the plaintiffs do not argue that this meets the requirements set out by Delaware law.

[167] ECF No. 91 at 22 (sealed).

[168] *See, e.g., Larian as Tr. of Larian Living Tr. v. Momentus Inc.*, 2024 WL 386964, at *1 (Del. Super. Ct. Jan. 31, 2024) (defining the SAFE agreements as investment contracts).

Nor can the plaintiffs avoid this deficiency by alleging that Wong breached duties that she owed to Suavei. A claim seeking recovery for injury to the corporation belongs to the corporation and must be pursued derivatively by a party with standing to do so.[169] The plaintiffs offer no evidence or analysis showing that they have that standing. Because no reasonable factfinder could conclude that the plaintiffs were Suavei stockholders to whom Wong owed fiduciary duties of care or loyalty, I grant Wong summary judgment on this final claim.

**Conclusion**

IT IS THEREFORE ORDERED that Wong's motion for summary judgment **[ECF No. 88] is GRANTED. The Clerk of Court is directed to ENTER FINAL JUDGMENT in favor of the defendant and against the plaintiffs and CLOSE THIS CASE.**

IT IS FURTHER ORDERED that Third-Party Witness's motions to seal **[ECF Nos. 96, 97, 102]** are **DENIED. The Clerk of Court is directed to UNSEAL those motions [ECF Nos. 96, 97, 102] but to maintain the seal on ECF No. 91.**

IT IS FURTHER ORDERED that the Clerk of Court is directed to change any references to DeJoy in docket entries to "Third-Party Witness." This limited relief does not require redacting references on or within otherwise public filings.

IT IS FURTHER ORDERED that the plaintiffs' motion to extend time to file a reply in support of cross-motion for partial summary judgment and for leave to file surreply **[ECF No. 101]** is **DENIED.**

U.S. District Judge Jennifer A. Dorsey
August 14, 2026

[169] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004).